THE PEARL STREET CONGREGATIONAL SOCIETY *vs*. IMLAY.

While it is a general principle, that a discharge, by a creditor, of securities for
a debt held by him, without the consent of the surety for such debt, dis-
charges the surety, to the extent of the value of the securities, yet, a cred-
itor may have taken such securities, under an arrangement with the debtor,
which binds him, in good faith, to discharge them.

A discharge by a creditor, of securities so held, without notice to the surety,
and after the bankruptcy of the debtor, does not necessarily discharge the
surety.

Where a creditor, after the failure of the surety, who was an accommodation
endorser of a negotiable note, not then due, applied to the maker of the note,
for further security,—who thereupon made a mortgage of real estate suffi-
cient to secure the debt, upon the parol condition that the creditor should
release the mortgaged premises, upon the debtor's providing other satisfactory
security, soon after which the debtor became bankrupt,—and some months
after, and before said note became due, the creditor accepted, as security, an
endorsement of said note, by a responsible person, under the name of the

---

* 23 Little & Brown's Law & Eq. Rep., 132.

Pearl Street Congregational Society *v.* Imlay.

original surety, and thereupon, without notice to the original surety, released said mortgaged premises,—the fact that such mortgage had been taken, and was held by the creditor, having been known to said surety, but said agreement to discharge the same being wholly unknown to him ; it was held, in a suit by the creditor, against such original surety, on the note so endorsed, that the above facts constituted no valid defence.

THIS was · an appeal from the doings of the commissioners, on the estate assigned by William H. Imlay, for the benefit of his creditors, allowing a claim against said estate, in favor of the Pearl street Congregational society of Hartford. The cause was submitted to the superior court, at the term holden in January, 1854, on the following agreed statement of facts, and was reserved for the advice of this court.

On the first day of June, 1851, Joseph Wales purchased of the Pearl street Congregational society, a lot of land, in the city of Hartford, for $——, and by the terms of sale, he was to bring a good endorsed note for the price, payable in one year. He proposed to said society, to get a note endorsed by said Imlay, which said society agreed to accept.

Said Wales immediately procured and delivered to said society a note, for the sum of $1,645.83, dated June 10th, 1851, executed by himself, payable to said Imlay, and by said Imlay endorsed in blank, payable in one year from date, at the Connecticut River bank. The amount of said note was the price of said land, with one year's interest included.

Said Imlay endorsed said note wholly for the accommodation of said Wales, as his surety, and without security, but said society had no knowledge on the subject, except what is to be inferred from the foregoing facts.

· Said Imlay failed, on the 9th day of October, 1851, and said Pearl street society required of said Wales further security on said note, and said Wales thereupon gave them, for that purpose, a mortgage of said lot, including a brick dwelling-house, which had shortly before been erected thereon. Said mortgage was given by said Wales, without consulting said

Imlay, who, at the time, had no knowledge of the fact, though it became known to him immediately thereafter.

At the time said mortgage was taken, there was a mechanic's lien on the premises, for about $2,500.

Said Wales was then negotiating with the society for savings, for a loan of that amount, on the security of said premises, for the purpose of paying off said lien.

This fact was communicated to said Pearl street society, at the time said mortgage was given, and it was agreed by them, that if said Wales could obtain said loan, at said savings society, and would provide other satisfactory security, in the place of said mortgage, they would release the same.

None of these facts were, however, known to said Imlay, either then, or at any time afterward.

There was no other incumbrance on said property, except said lien, and said premises were of the value of $6,000.

Before said note fell due, to wit, on or about the first day of January, 1852, said society released said premises to said Wales, who, on the same day, mortgaged the same to said savings society, for $2,500, and also, on the same day, conveyed away to Elizabeth Wells, all his remaining interest in said premises; and said Wales, previously to the release of said mortgage, by said Pearl street society, and after said mortgage had been given to said Pearl street society, became insolvent, and left the state, and has not since had any visible property within this state.

Said release was given to said Wales, by said Pearl street society, wholly without the consent or knowledge of said Imlay, and said Imlay had no knowledge of the fact, until he discovered it from the town records, some days after.

At the time of releasing said mortgage, said Pearl street society accepted, as security upon said note, the endorsement of George M. Welch, who endorsed the same, by writing his name under that of said Imlay, on the back of said note.

Said Welch was a person of responsibility, but endorsed said note, supposing said Imlay to be liable, as a prior endorser on said note. Said Imlay had no knowledge of said Welch's endorsement.

When said note became due, demand was legally made upon said Wales, for payment of the same, and notice of non-payment was duly given to said Imlay and said Welch, and said note was, in the usual form, protested for non-payment, and has never been paid.

Said Imlay claimed to be discharged from his liability, as surety upon said note, upon the foregoing facts.

*Robinson* and *Welch*, with whom was *N. Shipman*, for the Pearl street society, contended,

1. That the doctrine of equity jurisprudence, which discharges the surety, when the creditor releases the securities to which the surety might otherwise have resorted for indemnity, is not to be applied inflexibly, either in courts of chancery or law, but its application must conform to the demands of practical equity. 1 Alabama, N. S., 23. U. S. Eq. Dig., p. 602, § 170. See also cases cited below.

(*a*) The rule is founded upon the idea of a constructive fraud on the part of the creditor, in abandoning the security, but this implication of fraud may be repelled, by the circumstances of the transaction. 13 Metc., 187 (192.) It is not fraudulent to substitute one security for another, nor can a surety plead such substitution, as a discharge of his liability. U. S. Eq. Dig., p. 602, § 164. *Neff's Appeal.* 9 Serg. & Watts, 36.

(*b*) In the present case, if Imlay ever had any rights whatever, in respect to the securities in question, (which is denied,) a court of equity would make Welch's endorsement available to him, by an act of subrogation.

2. The security was taken under such circumstances, that the creditor had a right to release it, without affecting the obligation of the surety.

(*a*) It was obtained by the creditor's active diligence, and it is well settled, that such securities may be released, without discharging the surety. 12 Mass., 503. *Baker* v. *Marshall*, 16 Verm., 522. Chitty on Bills, 147, (a) (n.) *Bellows* v. *Lovell*, 4 Pick., 153. *Montpelier Bank* v. *Dimon*, 4 Verm., 599. Am. Leading Cases, 257, 258, 259. This rule is not confined to securities obtained by legal process. 13 Metc., 187.

(*b*) It was taken only on account of a change in the circumstances of the surety himself, and as a guaranty against his default; and he had no right to regard it as obtained for his benefit, or to complain of its surrender. If it had been a mortgage, conditioned on Imlay's resuming payment, he could hardly have laid claim to it, as a security to which he was equitably entitled for his indemnity.

(*c*) It was a conditional security only, and, as the condition had been fulfilled by the debtor, the release was required by good faith, and was the mere discharge of a legal obligation. The security could not be more beneficial to the surety than to the creditor, and the former can not complain, that the terms on which it was received compelled its surrender, before it became available to him.

*Hooker*, for William H. Imlay, contended, 1. That there is nothing, in the fact, that this mortgage was taken after the note was endorsed, that it was procured without the knowledge of the surety, and by the diligence of the creditor, and that it was taken on account of the failure of the surety, that can deliver the case from the application of the well-established principle, that a discharge, by the creditor, of securities held by him, without the consent of the surety, discharges the surety, to the extent of the value of the securities. 8 Pick., 122, 129. 2 Swanston, 199. 1 Sto. Eq., § 326. 257, *et seq.* Story on Contracts, § 872. 8 Serg. & Rawle, 457. 2 Am. Leading Cases.

2. That the only fact, which can raise a serious question in the case, is, that the mortgage was given, under an agreement of the society to release it, on other security being substituted. This fact ought not to deliver the case from the application of the general principle stated above.

1. This agreement is inadmissible in evidence, because *parol.*

[By the statement of facts, all matters inadmissible in evidence are to be excluded, by the court.]

(*a*) Being *parol*, it can not affect real estate. It was an agreement to convey land.

(*b*) Being made before the mortgage was given, it is inadmissible for the purpose of varying the written contract.

The written contract was a conveyance of land, defeasible only by payment of the note.

2. This agreement ought not to affect us, because we had no notice of it. The records not only did not show it, but really showed the contrary. We have thereby been lulled into a false security.

3. This agreement, even if valid, did not authorize the release of the mortgage, upon the security substituted by Wales. The security substituted, was of no value to us, Welch's endorsement being under ours. The agreement required other *satisfactory security* to be given. The society had no right to accept, as satisfactory, such security. They had no right to look out for their own interest only, wholly regardless of ours. "A creditor, holding collateral security, is bound to use it *impartially and justly, for the benefit of the surety, as well as himself.* 6 Smedes & Marshall, 24. 4 Johns. Cha., 129. 8 Pick., 122, 129. 1 Sto. Eq., § 324. 2 Am. Leading Cases, 261, 262. 4 Met., 176, 177.

4. The failure of Wales, in the mean time, created a new state of facts, which made it specially incumbent on the society, to make no change of the securities, which would injure Imlay.

ELLSWORTH, J.   We do not think it is necessary to comment upon the numerous cases which have been read, illustrating and enforcing the principle of equity, equally well settled in England and here, that any security which has been appropriated by the debtor, to secure his debt, whether it be placed in the hands of the creditor or the surety, shall be made available for the debt and for *his* benefit, who is forced to pay it.   It is treated as a fund, set apart for that purpose.   The principle itself is founded in the highest justice and wisdom, while, in applying it to cases, as they arise, there are distinctions and circumstances, that must be observed, as essentially belonging to the principle itself.

Nothing can be more obvious, than that, if the creditor will insist upon collecting his debt out of the surety or endorser, while he has the property of the debtor in his hands, he shall make over that property to him who pays the debt, that it may be applied, as it ought to be, to relieve and indemnify the surety.

Now, if this were all, if Wales had merely given his creditors additional security, the surety might justly insist upon having the benefit of it, as claimed, but there is much more than that here.   There is a controlling circumstance, bearing strongly upon the supposed equity, set up by Mr. Imlay. Mr. Wales did not *appropriate* the security unconditionally, to secure his debt, but he merely made an arrangement for temporary relief, in the particular emergency.   He did what he was under no obligation to do.   Mr. Imlay had suspended payment; the society had expressed their dissatisfaction with the security, and Mr. Wales agreed to give them the mortgage in question, for a short time, until he could procure a satisfactory name.   He, and the society, stipulated that the mortgage should be released, in order that he might mortgage the property to the savings society, to raise money to pay off the mechanic's lien.   Mr. Imlay had nothing to do with this private arrangement, nor had he knowledge of it, nor did he become surety, in consequence of it, nor

did he notify the society to retain the security, for his benefit. He had, in fact, no connection with it, further than what the law created, which, under the circumstances, we hold, did not create a right of subrogation or substitution. When Mr. Wales gave the society a satisfactory name, they were absolutely *bound* to release the mortgage, as they agreed, and he could and in fact, did, in good faith, mortgage anew. We do not mean to say, that a surety can not claim a right to property, appropriated by the debtor, unless he had knowledge of it at the time, or gave notice to have it kept for him, or became surety expressly upon the faith of the appropriation. This may not be necessary, but in this case, a different principle applies, which must control us, as we have endeavored to show, steering clear of all these questions.

It is objected, that the contract between Mr. Wales and the society was in *parol* and could not be proved. Not so. Even if the evidence is obnoxious to the statute of frauds, which we do not decide, the society, in justification of their act, can show the agreement, and their good faith, in performing it. Besides, the statute only says, " no action shall be brought," &c., and not that the contract is absolutely void. Moreover, it is executed, and this is conclusive.

We advise judgment for the plaintiffs.

In this opinion the other judges concurred.

Judgment for the plaintiff.